## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Anthony Skiff,** | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | :     **Case No. 3:05cv1040 (JBA)** |
| **Colchester Board of Education,** | : |
| **John H. Vitale, Jeffrey Mathieu,** | : |
| **and Barbara Gilbert,** | : |
| **Defendants.** | : |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 35]

Plaintiff Anthony Skiff alleges in four counts that the
defendants — the Colchester Board of Education, John H. Vitale
(the Superintendent of Bacon Academy), Jeffrey Mathieu (the
Principal), and Barbara Gilbert (Assistant Principal) — have
(1) violated his civil rights under 42 U.S.C § 1983 by denying
him the equal protection of the law, (2) denied him due process
by depriving him of a property interest in his employment,
(3) denied him due process by depriving him of his liberty
interest in his good name through making disparaging remarks, and
(4) violated the Age Discrimination in Employment Act (ADEA) by
discriminating against him on the basis of his age.  Defendants
move to dismiss all counts against them [Doc. # 35], arguing that
the plaintiff cannot identify sufficiently similar comparators to
prevail on his equal protection claim; that he received all the
process he was due; and that he has failed make a prima facie

case of discrimination, or, if he has, that he cannot show pretext on their part. For the following reasons, the motion is granted.

## I. **Factual Background**

Anthony Skiff was born in 1943. (Pl.'s 56(a)(2) Statement ¶ B.1.) He holds B.A., M.A., and Ph.D. degrees in sociology. (Id. ¶ A.6.) From 1970 until 1974, Skiff taught at Bradley University, and thereafter at the University of Connecticut, Avery Point branch, from 1974 until 1982. (Id. ¶ A.7.) Neither appointment was a tenure-track position. (Id.) In 1984, plaintiff began work with the Division of Worker Education, where he worked until 1995 when the organization was eliminated and he was moved to the Workers' Compensation Commission in the position of a safety officer. (Id. ¶¶ A.8-9.)

In 1997, Skiff retired from state service and pursued the Connecticut Alternate Route to Certification program to obtain his teaching certificate, completing it in 1999. (Id. ¶¶ A.11-12.) He was then hired in a part-time teaching position (two classes) for the 2000-01 school year at Bacon Academy in the Colchester public school system. (Id. ¶¶ A.13, A.25.) In this first year, Skiff was evaluated by Jeffrey Mathieu, and received generally positive ratings and comments. (Id. ¶¶ A.27-28.) The evaluation system involved classroom evaluation reflected in binary form as to whether the evaluator observed specific listed

teacher performance criteria, as well as written comments. (Id. ¶ A.16.)

In plaintiff's second year, a new evaluation system derived from Connecticut's Common Core of Teaching came into effect. (Id. ¶¶ A.7-18; see Ex. F.) This required all non-tenured teachers to be observed three times by a school administrator in their first two years, two times thereafter. (Id. ¶¶ A.19-20.) Each evaluation covered a single observed class, on which the evaluator graded the teacher on the listed competencies with one of four possible ratings — "Unsatisfactory," "Developing," "Accomplished" (later changed to "Proficient"), or "Exemplary" — and was able to write in comments. (Id. ¶¶ A.21-22.) Additionally, year-end summary evaluations incorporated the observation results, as well as other information derived from sources such as attendance records. (Id. ¶ A.23.) Typically, the teacher would meet with the evaluating administrators both before and after the summative evaluations were prepared. (Id.)

After his first year, plaintiff taught full time in the Social Studies Department and carried a full course load. (Id. ¶¶ A.30, A.36.) Again, the Plaintiff was evaluated by Mr. Mathieu, and received passing marks under the new evaluation system (mostly "Developing" or "Accomplished"). (Pl.'s Dep., Exs. 4-5.)

In connection with the Common Core of Teaching, the state

Department of Education also initiated the Beginning Educators Support and Training ("BEST") program, under which all second-year teachers were required to submit a video portfolio to retain their teaching certificates. (Pl.'s 56(a)(2) Statement ¶¶ A.37-38.) The portfolio was graded on a scale of 1 ("conditional," the lowest mark) to 4 ("advanced," the highest) by an anonymous grader who was often a trained veteran teacher. (Id. ¶¶ A.39-40.) Passing the portfolio resulted in an extension of the teacher's certification for 8 years; failing meant that the teacher must submit a passing portfolio in his or her third year or lose certification. (Id. ¶¶ A.41-43.) Plaintiff failed his first portfolio but passed (earning a "4") in his third year. (Id. ¶¶ A.44, A.90.)

In Skiff's third teaching year (2002-03), a new assistant principal, Barbara Gilbert, was hired and became one of the administrators who performed evaluations. (Id. ¶¶ A.58-59.) With her addition, evaluation assignments were redistributed among administrators based on expertise and equalized workloads. (Id. ¶ A.60.) She was assigned the Social Studies Department, and thus became the plaintiff's evaluator. (Id. ¶¶ A.61, A.64.)

Gilbert evaluated Skiff three times during his third year. (Id. ¶ A.73.) In the first and third observations, plaintiff received markedly lower ratings than he had from Mr. Mathieu, including several "Unsatisfactory" grades. (Id. ¶¶ A.65-66,

A.74.)  In the second observation, Skiff received no failing grades and a mixture of positive and critical feedback.  (Id. ¶¶ A.70-71.)  In response to the third evaluation, plaintiff filed a statement of rebuttal, in which he graded himself as being "Proficient" or "Exemplary" in all areas, describing the observation as "fully successful, achieving exactly the objectives set by the teacher for it.  Criticisms are based on redefining the lesson's scope and purpose."  (Id. ¶¶ A.76-77.)  In the year-end evaluation, Skiff received failing marks, including in the category of "self-reflection."  (Id. ¶ A.83.)  He also filed a rebuttal to this evaluation, again rating himself as "Proficient" or "Exemplary" in all areas.  (Id. ¶ A.85.)

Dr. Vitale, the superintendent, had directed his administrators to keep him updated on any concerns they had with any of the teaching staff.  (Id. ¶ A.88.)  In connection with this request, Mr. Mathieu met with Dr. Vitale at the end of the 2002-03 school year to discuss Plaintiff's performance.  (Id. ¶ A.89.)  No formal recommendation was made to non-renew plaintiff's contract, and Dr. Vitale felt that, in light of the disparity between the evaluations of plaintiff's first two years and his third, he should be given another year in which to improve.  (Id. ¶ A.89.)

For Skiff's fourth year (2003-04), the Plaintiff requested a different evaluator than Gilbert.  (Id. ¶ A.91.)  Ultimately, the

Administrative Council decided that it would be unfair to let teachers pick their evaluators, but that teachers could request a second administrator to participate in the evaluations. (<u>Id.</u> ¶ A.94.) Plaintiff requested Mathieu, so for his fourth year, his evaluators were Gilbert and Mathieu. (<u>Id.</u> ¶ A.95.) The observing evaluators sat in different parts of the classroom, and prepared draft evaluation forms separately before completing one joint evaluation. (<u>Id.</u> ¶ A.97.) In his first evaluation of the year, Skiff received one "Unsatisfactory" rating and mixed comments. (<u>Id.</u> ¶¶ A.99-101.) Following the format he previously used, plaintiff submitted another rebuttal to this evaluation, grading himself as "Exemplary" in every category save "Teacher Demonstration of Professional Responsibility," where he graded himself "Accomplished." (<u>Id.</u> ¶ A.102.) Gilbert and Mathieu evaluated Skiff again a few months later, and after again giving Skiff "Unsatisfactory" marks, he filed another rebuttal. (<u>Id.</u> ¶¶ A.106-09.) In the summative evaluation of his fourth year, plaintiff received three failing marks, and was formally recommended for non-renewal. (<u>Id.</u> ¶ A.112-14.) Plaintiff never filed any union grievance related to any evaluations. (<u>Id.</u> ¶ A.115.)

On March 22, 2004, on the advice of his union, Plaintiff submitted a letter of resignation, but withdrew it four days later. (<u>Id.</u> ¶ A.116-17.) On March 29, plaintiff received a

letter informing him that Dr. Vitale intended to recommend to the
Board of Education that his contract not be renewed.  (<u>Id.</u>
¶ A.118.)  Skiff attended the meeting where the motion not to
renew his contract passed; he also received written confirmation
of this.  (<u>Id.</u> ¶ A.120.)  On March 30, plaintiff wrote to Dr.
Vitale requesting a statement of the reasons for the non-renewal.
(<u>Id.</u> ¶ A.121.)  Plaintiff received this statement on April 5, and
subsequently requested a hearing from the Board of Education to
contest the non-renewal of his contract.  (<u>Id.</u> ¶¶ A.122, A.124.)

The non-renewal hearing took place over three nights (a
total of ten hours) before a quorum of the Colchester Board of
Education in executive session.  (<u>Id.</u> ¶¶ A.127-129.)  During the
hearing, Skiff was permitted to present evidence, and the Board
retained an attorney to ensure compliance with the statutorily-
mandated procedure.  (<u>Id.</u> ¶¶ A.135, A.137.)  The Board re-
affirmed the decision not to renew his contract, of which
plaintiff received written notification.  (<u>Id.</u> ¶¶ A.138-39.)  No
other such hearings had occurred during the tenure of Dr. Vitale
or even in the twelve-year tenure of Board of Education member
Mr. Hettrick.  (<u>Id.</u> ¶ A.142.)

## II.  Discussion

### A.    Standard

Summary judgment is appropriate under Federal Rule of Civil
Procedure 56(c) when the moving party establishes that there is

no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex, 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at

324); see also Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-1224 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. Anderson, 477 U.S. at 249 (noting that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

   B.   **Equal Protection**

"The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). A plaintiff claiming denial of equal protection rights can proceed according to several theories. The Supreme Court has held that a plaintiff need not be a member of a traditionally

protected class in order to allege an equal protection violation, but may maintain a "class of one" equal protection claim, so long as he or she was treated differently from similarly situated persons with no rational basis for such treatment. Vill. Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Alternatively, a plaintiff may also assert the "related, yet different" equal protection claim of selective prosecution, which is based on different treatment stemming from some impermissible reason. Cobb v. Pozzi, 363 F.3d 89, 109-10 (2d Cir. 2004).

### 1. Class of one

To establish a "class of one" equal protection claim, a plaintiff must show (1) that he has been treated differently from others similarly situated and (2) that the different treatment has no rational justification. African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 363 (2d Cir. 2002). To prove the first element, "the level of similarity between [a] plaintiff[] and the [comparators] must be extremely high," even to the point of being "prima facie identical in all relevant respects." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (citation and quotation marks omitted). In other words, the plaintiff must show that

> no rational person could regard the circumstances of
> the plaintiff to differ from those of a comparator to a
> degree that would justify the differential treatment on
> the basis of a legitimate government policy [and that]
> the similarity in circumstances and difference in
> treatment are sufficient to exclude the possibility

10

that the defendant acted on the basis of a mistake.
Id. at 105.

Here, the plaintiff presents four comparators.  However, the
dissimilarities between these individuals and the plaintiff are
fatal to his claims.  None of the comparators failed his or her
BEST portfolio.  (Gilbert Aff. ¶ 6.)  Plaintiff received twenty
"Unsatisfactory" marks on his evaluations during his last two
years of teaching, whereas three of his four comparators did not
receive a single "Unsatisfactory" mark and the fourth received
only one.  None of the other teachers cited as comparators were
up for tenure in the same year as the plaintiff.  Thus, the
Plaintiff's "class of one" theory of equal protection violation
fails for lack of a prima facie identical comparator.  Moreover,
even with these comparators, plaintiff fails to adduce evidence
of such that reasonable jurors would have to exclude the
possibility of mistake or a legitimate motive.

## 2.  Selective Prosecution

The plaintiff also advances an equal protection claim based
on a theory of selective prosecution, which requires him to show
(1) that he was treated differently from others similarly
situated, and (2) that such treatment was based on an
"impermissible consideration[]."  Harlen Assocs., 273 F.3d at 499
(quotation marks omitted).  To this the defendants respond that
Skiff failed to plead or otherwise signal that he was adopting

this particular claim, and that he should therefore should be precluded from pursuing the theory.  (Def.'s Reply at 9.)

Assuming that the defendants were on notice of this equal protection theory based on the plaintiff's factual allegations, see Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005), he must still meet the "similarly situated" standard.  As above, the evidence shows that the comparators were not sufficiently similar to Skiff — here, excepting their age — to give rise to an equal protection violation.  But even if Skiff could make this showing, his claim that he was treated differently than other similarly situated based on his age is "inextricably linked" to his ADEA claim, for each require sufficient evidence to support an inference of age-based discrimination.  Cobb, 363 F.3d at 110 (considering plaintiffs' selective prosecution claim based on associational membership together with their First Amendment retaliation claim); African Trade, 294 F.3d at 363 (finding that "plaintiffs' factual allegations throughout the case require the conclusion that their equal protection claim [based on retaliation for political speech] and their First Amendment claim coalesce").  Therefore, to the extent Skiff has made a showing of prima facie similarity to the four comparators, his selective prosecution claim "coalesce[s]" with his ADEA claim, and will be further addressed infra.

## C.    Due Process — Deprivation of Property Interest

The plaintiff contends that his property interest in his job was violated when he was deprived of a meaningful opportunity to be heard prior to his termination, thus violating 42 U.S.C. § 1983.  (Am. Compl. ¶¶ 41-46.)  The parties do not dispute that plaintiff had a property interest in his continued employment, see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985), but the defendants contend that Skiff received all of the process he was constitutionally due.

Before he could lawfully be deprived of his employment, the plaintiff must have had an "opportunity to be heard at a meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319, 332 (1976) (quotation marks omitted). This generally means that "[a]n employee who has a property interest in his employment 'is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story,' before he is subjected to the loss of his employment."  Munafo v. Metro. Transp. Auth., 285 F.3d 201, 212 (2d Cir. 2002) (quoting Loudermill, 470 U.S. at 541).

While a state may add additional procedural guarantees, the federal constitutional requirements are the measure of a § 1983 violation.  Vitek v. Jones, 445 U.S. 480, 491 (1980); Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2003).  In this case, the

13

plaintiff's hearing was conducted pursuant to Conn. Gen. Stat.
§ 10-151(c), which describes the process by which a non-tenured
teacher may seek review of a notice of non-renewal or
termination.[1]  Skiff challenges the constitutionality of § 10-
151(c), claiming that it allows the Board of Education — which is
responsible for approving the non-renewal presented by the
superintendent — to review its own decision, thereby robbing the
process of the impartiality implicitly required for due process.

---

[1] The statute provides, in relevant part:

The contract of employment of a teacher who has not attained
tenure may be terminated at any time for any of the reasons
enumerated in . . . this section; . . . [s]uch teacher, upon
written request filed with the board of education within
twenty days after the receipt of notice of termination, or
nonrenewal shall be entitled to a hearing, except as
provided in this subsection,

   (A) before the board,

   (B) if indicated in such request and if designated by
   the board, before an impartial hearing panel
   established and conducted in accordance with the
   provisions of subsection (d) of this section, or

   (C) if the parties mutually agree before a single
   impartial hearing officer chosen by the teacher and the
   superintendent in accordance with the provisions of
   subsection (d) of this section. . . .

The impartial hearing panel or officer or a subcommittee of
the board of education, if the board of education designates
a subcommittee of three or more board members to conduct
hearings, shall submit written findings and recommendations
to the board for final disposition.  The teacher shall have
the right to appear with counsel of the teacher's choice at
the hearing. . . .

The board of education shall rescind a nonrenewal decision
only if the board finds such decision to be arbitrary and
capricious.

Conn. Gen. Stat. § 10-151(c) (paragraph breaks added).

14

However, § 10-151(c) expressly contemplates the risk of bias in the proceedings, and permits the teacher seeking review to "request . . . an impartial hearing panel" or "a single impartial hearing officer" to preside over the hearing. See Simard v. Bd. of Educ., 473 F.2d 988, 994 (finding the Board of Education's hearing held pursuant to a substantially similar predecessor statue consistent with procedural due process).

As to whether the defendants failed to provide Skiff with the procedures of § 10-151(c), the evidence is undisputed that plaintiff was notified by April 1 (Pl.'s Dep., Ex. 29); that the non-renewal letter was supplemented with a statement of the reasons for non-renewal (Pl.'s Dep., Ex. 30); that a hearing was held before a subcommittee of the Board when requested (Pl.'s Dep., Exs. 33-35); and that the Board delivered a written statement to the plaintiff stating that it found the failure to renew him neither arbitrary nor capricious (Pl.'s Dep., Ex. 36).

Thus, defendants followed the procedure outlined in § 10-151(c). Plaintiff claims, however, that the procedure was tainted by bias, for an impartial decision-maker is a basic constituent of due process. Goldberg v. Kelly, 397 U.S. 254, 271 (1970); Wolkenstein v. Reville, 694 F.2d 35, 41 (2d Cir. 1982). It is undisputed that the Board relied on the advice of counsel to ensure its compliance with the statute. (Pl.'s 56(a)(2) Statement ¶ A.137.) Plaintiff's evidence claimed to show

partiality is that one member of the panel ate a sandwich during one night of the hearing for a half-hour and then read a newspaper for another fifteen minutes, that one Board member asked helpful questions of an administration witness, that the panel was unmoved by his evidence, and that the panel did not deliberate long enough.  (Id. ¶¶ A.140-41.)  In the context of a ten-hour hearing spread out over three nights, no reasonable person could infer partiality from these facts.

Plaintiff further claims that the Board deprived him of due process by prejudging the merits of his case.  However, there is nothing in the record to support this contention other than Skiff's characterizations of the hearing as a "flawed process" and a "pretextual sham."  (Pl.'s Mem. in Opp. at 34.)  Such a contention would have to "overcome [the] presumption of honesty and integrity" granted to adjudicators in the administrative review context.  Withrow v. Larkin, 421 U.S. 35, 47 (1975).  As the Second Circuit explained in Simard, even where a plaintiff contesting termination had prior dealings with the members of the reviewing panel, "absent a showing of actual, rather than potential, bias," such a hearing is not constitutionally deficient as a matter of law for reason of partiality.  473 F.2d at 993.

Therefore, summary judgment for the defendants is granted on this count, as the plaintiff has failed to show evidence on which

16

a reasonable fact-finder could conclude that he received constitutionally inadequate process.[2]

## C.   Due Process - Deprivation of Liberty Interest

In his second due process claim, plaintiff alleges that the defendants made "false and disparaging remarks" about him, thereby damaging his reputation.  "A person's interest in his good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or to create a cause of action under § 1983."   Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004).  However, harm to one's reputation may trigger such protections if "coupled with the deprivation of a more tangible interest, such as government employment," which can give rise to what is known as a "stigma-plus" claim.  Id. at 330.

---

[2] Plaintiff's remaining arguments regarding procedural due process are without merit.  Skiff relies on Bartlett v. Krause, 209 Conn. 352, 360-61, 551 A.2d 710 (1988), in support of his contention that he "was never given a meaningful opportunity to invoke the discretion of the decisionmaker," yet that case involved the dismissal of a fire marshal pursuant to a different statutory scheme.  In addition, the court declined to address the issue of decision-maker impartiality due to "effective[] waive[r] by the plaintiff." Id. at 379 n.20.
Skiff also apparently contends, without elaboration, that he was prevented from submitting evidence or calling witnesses. (Pl.'s 56(a)(2) Statement ¶ A.136.)  But this is contradicted by his own deposition testimony, in which, following the question "Were you prevented from submitting any evidence or calling any witnesses [during the non-renewal hearing]?" Skiff responded, "No, I wasn't."  (Pl.'s Dep. at 108.)

To prove a stigma-plus claim, the plaintiff must show that the "information involved . . . call[ed] into question the plaintiff's 'good name, reputation, honor, or integrity.'" <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 446 (2d Cir. 1980) (<u>quoting</u> <u>Wis. v. Constantineau</u>, 400 U.S. 433, 437 (1971)). The Second Circuit has described this stigma as one which "go[es] to the very heart of [the employee's] professional competence," and which "will seriously impair his ability to take advantage of other employment opportunities." <u>Huntley v. Community Sch. Bd.</u>, 543 F.2d 979, 985 (2d Cir. 1976). A plaintiff must "raise the falsity of these stigmatizing statements as an issue," "prove [they] were made public," and "show the stigmatizing statements were made concurrently in time to plaintiff's dismissal from government employment." <u>Patterson</u>, 370 F.3d at 330; <u>see also</u> <u>Velez v. Levy</u>, 401 F.3d 75, 89 (2d Cir. 2005) ("perfect parity" is not required). Being an allegation premised on procedural due process, a stigma-plus claim can be remedied by "the availability of adequate process." <u>Segal v. City of New York</u>, 459 F.3d 207, 213 (2d Cir. 2006). Thus, the constitutional standard requires granting the plaintiff a hearing affording him "an opportunity to hear and answer first-hand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation." <u>Patterson</u>, 370 F.3d at 335.

The plaintiff points to no specific examples of "false and

disparaging remarks," and the Court is left without guidance as
to what these alleged remarks were.  However, the record suggests
several possibilities: the evaluations of plaintiff, the letter
from Dr. Vitale to the plaintiff providing the reasons for his
non-renewal, the non-renewal hearing itself, and the totality of
the non-renewal process.  Even in the light most favorable to the
plaintiff, the evaluations fail to establish a stigma-plus claim,
for they contain nothing which could rise to the level of
"stigmatizing," i.e., calling into question the plaintiff's good
name, reputation, honor, or integrity, or denigrating his
competence as a professional.  In comparison, the statements at
issue in other cases have been markedly more harmful.  See, e.g.,
Segal, 459 F.3d at 209-10 (accusing plaintiff-teacher of
condoning and encouraging fighting between schoolchildren);
Patterson, 370 F.3d at 331 (taking kickbacks, embezzling, and
dealing drugs); Quinn, 613 F.2d at 443 (mismanagement and
embezzlement).  In this case, despite negative comments about
aspects of plaintiff's teaching capabilities, no comment
attributed to him the kind of gross misconduct or incompetence
that could be considered stigmatizing.

The letter stating the reasons for non-renewal is similarly
deficient as proof of a stigma-plus claim.  Nothing in the letter
posits such complete professional misconduct that would burden
the plaintiff with a roadblock to future employment.  Moreover,

the letter was not even made public by the school.  The hearing
itself is also an insufficient basis for a claim.  It was
conducted in executive session, and Skiff had the opportunity to
present his side and to question the other.  Such a hearing under
these circumstances cannot create actionable stigma.

Finally, the Board's actions in refusing to renew the
plaintiff fall short.  In O'Connor v. Pierson, a case in which a
teacher asserted a stigma-plus claim based on actions by a school
review panel, the Second Circuit concluded:

> Both [plaintiff's] complaint and his brief on appeal
> posit that his stigma arose from the Board's actions,
> not from its statements.  In effect, [plaintiff] has
> alleged the plus without the stigma, and argues that
> the plus alone has created the stigma.  Even if
> [plaintiff] is correct that townsfolk drew negative
> inferences from his suspension, this is not enough to
> make out a stigma-plus claim.  The district court
> properly granted summary judgment in the Board's favor
> on this claim.

426 F.3d 187, 195-96 (2d Cir. 2005) (footnote omitted).  More
generally, as the Supreme Court noted, "[i]t stretches the
concept too far to suggest that a person is deprived of 'liberty'
when he simply is not rehired in one job but remains as free as
before to seek another.  Bd. of Regents v. Roth, 408 U.S. 564,
575 (1972).

Therefore, because no evidence in the record can form the
basis for a valid stigma-plus claim, plaintiff's allegation that
he was deprived a liberty interest without due process fails.
Summary judgment is thus appropriate on Skiff's due process

claims.

**D.  ADEA**

Skiff alleges that the defendants violated the ADEA by discharging him because of his age.  See 29 U.S.C. § 623(a)(1).  Although the Amended Complaint does not explicitly limit the ADEA claim to defendant Colchester Board of Education, it is clear that the ADEA precludes individual liability, and so the remainder of this discussion will concern only the Board.  See Cherry v. Toussaint, 50 Fed. Appx. 476, 477 (2d Cir. 2002); Parker v. Metro. Trans. Auth., 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000).

The ADEA prohibits discrimination by employers against employees who are age 40 or older.  29 U.S.C. §§ 623(a)(1), 631(a).  To evaluate a claim brought under the ADEA, this Court follows the familiar McDonnell Douglas burden-shifting framework, under which the plaintiff must first make out a prima facie case of discrimination by "show[ing] that he was (1) within the protected age group; (2) qualified for the position; (3) discharged; and (4) that such discharge occurred under circumstances giving rise to an inference of discrimination." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  If the plaintiff makes out his prima facie case, then the burden shifts to the employer to "articulate some legitimate,

nondiscriminatory reason" for the discharge.  <u>McDonnell Douglas</u>,
411 U.S. at 802.  "If the defendant carries this burden of
production, the presumption raised by the prima facie case is
rebutted," and the plaintiff retains the burden of persuading the
court that the defendant's "proffered reason was not the true
reason for the employment decision."  <u>Texas Dept. of Community
Aff. v. Burdine</u>, 450 U.S. 248, 256 (1981).

### 1.  Plaintiff's prima facie case

Skiff readily establishes the first three prongs of his
prima facie case.  Born in 1943, he is over the age of 40 and
thus in the class protected by the ADEA.  (Pl.'s 56(a)(2)
Statement ¶ B.1.)  As the plaintiff was initially hired for the
job from which he was discharged, he is deemed qualified at the
level required for a prima facie case.

The defendant challenges the fourth prong of the prima facie
case.  "A plaintiff may raise" an inference of discrimination
through evidence that his "employer subjected him to disparate
treatment, that is, treated him less favorably than a similarly
situated employee outside his protected group."  <u>Graham v. Long
Island Rail Road</u>, 230 F.3d 34, (2d Cir. 2000).  Here, plaintiff
shows only that his contract was non-renewed and that the
significantly younger, renewed teachers were evaluated using
words and phrases like "enthusiastic," "energetic," "willing to
try new things," and "growing," as compared with plaintiff being

22

described as "unwilling to change," "inflexible," and "difficultly taking criticism."  This arguably permits an inference of youth bias.  Given the de minimis burden of production at this stage and taking the facts in the light most favorable to the plaintiff, the fourth prong of the prima facie case is satisfied.

### 2.  Colchester's proffered defense

With Skiff's prima facie case established, the burden then shifts to the Board "to introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993) (emphasis omitted).  In the letter to Skiff setting forth non-discriminatory reasons for the non-renewal of his contract, Dr. Vitale specifically cited Skiff's "fail[ure] to demonstrate improvement in the instructional areas that the administration [noted] as weaknesses"; lack of "improvement in creating instructional opportunities that support students' academic, social and personal development"; "significant deficiencies in the area of effective communications with students"; "assessment techniques used to assess student learning [which] fall well short of the standards expected within the district"; and "failure to take responsibility for improving these performance problems."  (Pl.'s Dep., Ex. 30 at 1–2.)

Thus, the Board carries its burden of articulating and

producing supporting evidence of legitimate nondiscriminatory reasons for having discharged Skiff.

### 3. Pretext

The burden therefore "shifts back to plaintiff to present sufficient evidence for a reasonable jury to conclude that defendant[] discriminated against him because of his age." Schnabel v. Abramson, 232 F.3d 83, 89 (2d Cir. 2000) (quotation marks omitted). The extent of this burden varies on a case-specific basis; the question of whether the evidence is sufficient to withstand summary judgment depends on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000). Although a plaintiff need not necessarily "introduce additional, independent evidence of discrimination," the prima facie case must be coupled with "sufficient evidence to reject the employer's explanation" as pretextual. Id.

The plaintiff may demonstrate pretext through comparison with the treatment of other employees, Gibson v. American Broadcasting Companies, 892 F.2d 1128, 1134-35 (2d Cir. 1989), but discrimination may not be inferred from "circumstantial evidence that has no logical tendency to show that discrimination was present." Pollis v. New Sch. for Soc. Res., 132 F.3d 115,

123 (2d Cir. 1997). Factors which would be unconvincing in isolation may in combination permit a jury to infer discriminatory bias. <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 102 (2d Cir. 2001). However, the Court should not second-guess the defendant's business decisions, however unwise, so long as not made for discriminatory reason. <u>Dister v. Continental Group, Inc.</u>, 859 F.2d 1108, 1116 (2d Cir. 1988).

In this case, Skiff argues pretext by disputing the Board's characterization of his teaching record, challenging the subjectivity of the evaluation process, arguing disparate treatment of younger similarly situated teachers, and pointing to the use of various words and phrases as proxies for age to distinguish him from the younger teachers. First, plaintiff argues that defendant's characterization of his teaching record is inaccurate, and thus indicative of pretext. Specifically, he contends that "Defendant's assertion[s] that Plaintiff had a career long problem with classroom discipline" and "failed to engage in self-reflection" are contracted by the record. (Pl.'s Mem. in Opp. at 26.) However, the non-renewal letter explained that Skiff's problems were not disciplinary, but rather related to his ineffective communications with students and subpar student assessment techniques. More importantly, Dr. Vitale emphasized that Skiff failed to take responsibility for these shortcomings even after several rounds of administrative review

and feedback.  Plaintiff's performance evaluations show only ratings of "Unsatisfactory" or "Developing" in the category labeled "Engages in self-evaluation of the effects of their choices and actions on students and the school community." (Pl.'s Dep., Exs. 10-12, 14, 18, 20, 23.)  Furthermore, Skiff's own actions confirm this assessment, as he filed rebuttals to nearly all of his evaluations, in which he rated himself "Accomplished" or "Proficient" and often "Exemplary" in this category.  Given the failing marks, the pattern of rebuttals, the disparity between his self-evaluation and the administration's evaluations, and the concurrence of the joint evaluation, the record cannot support a finding of pretext on this criterion.

Second, plaintiff contends that the evaluative criteria are "entirely subjective," which is also without support in the record.  While Skiff is correct that "an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion," <u>Knight v. Nassau County Civil Service Comm'n</u>, 649 F.2d 157, 161 (2d Cir. 1981), he offers no evidence that the defendant employed such standards.  The categories and criteria for the evaluation forms are drawn from Connecticut's Common Core of Teaching, which is the State Board of Education's statement of the knowledge, skills, and competencies that a teacher should possess.  Each form uses four-level grading on a series of criteria and allows for additional

comments by the evaluator. Although some degree of subjectivity is inherent in any form of assessment, it is self-evident from the evaluation forms that the standards used were clearly described and targeted at the numerous attributes of a successful teacher.[3] Moreover, these criteria were consistent with the reasons for non-renewal given in Dr. Vitale's letter.

Third, as proof of pretext, plaintiff argues that defendant treated other teachers with equally serious and persistent

---

[3] The most convincing evidence that the criteria were fair and clear is the content of the form itself. In his representative October 30, 2002 evaluation, Skiff was graded according to: "Understands how students learn and develop"; "Understands how students differ in their approaches to learning"; "Is proficient in reading, writing and mathematics"; "Understands the central concepts and skills, tools of inquiry and structures of the discipline(s) they teach"; "Knows how to design and deliver instruction"; "Recognizes the need to vary instructional methods"; "Plans instruction based on knowledge of subject matter, students, the curriculum and the community"; "Selects and/or creates learning tasks that make subject matter meaningful to students"; "Establishes and maintains appropriate standards of behavior and creates a positive learning environment that shows a commitment to students and their successes"; "Creates instructional opportunities that support students' academic, social and personal development"; "Uses effective verbal, nonverbal and media communication techniques which foster individual and collaborative inquiry"; "Employs a variety of instructional strategies that enable students to think critically, solve problems and demonstrate skills"; "Uses various assessment techniques to evaluate student learning and modifies instruction as appropriate"; "Conducts themselves as a professional in accordance with the Code of Professional Responsibility"; "Shares responsibility for student achievement and well being"; "Engages in self-evaluation of the effects fo their choices and actions on students and the school community"; "Seeks out opportunities to grow professionally"; "Works collaboratively with mentor and other staff members"; and "Demonstrates a commitment to their students and a passion for improving their profession." (Pl.'s Dep., Ex. 10.)

problems leniently.  In support of this similarity, Skiff references the evaluations of four other teachers which he argues reported comparable deficiencies.  This, too, is unsupported by the record.  In his evaluations, Skiff received substantially more "Unsatisfactory" marks than the comparators: nearly one-sixth of the more than a hundred total marks he received on these forms were of this lowest rating.  In contrast, three of the four comparators received no "Unsatisfactory" marks, and the fourth received only one.  Looking to the frequency of the highest mark, "Exemplary," Skiff's evaluators gave him this rating four times, and only in the category relating to a teacher's subject-matter proficiency; this is consistent with Skiff's undisputed educational background.  However, the three comparators with the most extensive evaluation records each received this highest mark about twice as frequently as Skiff, generally spread across the various criteria.

Treating the four grades as having numerical equivalents of "1" through "4," it is further instructive to consider each teacher's average grade across the several categories.  Skiff's mean grade received was 2.2; in comparison, the mean grades received by the other four teachers were between 2.7 and 2.8, which is about twenty-five percent greater than Skiff. Admittedly, the record is noisy with respect to these evaluation records, and a fact-finder could possibly conclude that there is

little value in comparing Skiff to his colleagues in this manner. But no jury could find that this comparison amounts to evidence that Skiff was treated unfairly or that the non-renewal reasons were pretextual; if anything, it shows that the other four teachers were similar to each other, not to the plaintiff. The only reasonable inference, if any, to draw from this evidence is that Skiff received lower overall marks than his fellow teachers, making them insufficiently similar comparators. Given this dissimilarity, it is irrelevant that these colleagues were not discharged along with the plaintiff.[4]

Lastly, the plaintiff alleges that his evaluators used certain code words which substituted for comments about his age and in effect signaled the type of discriminatory treatment that the ADEA prohibits. According to plaintiff, younger teachers were evaluated using terms including "enthusiastic," "energetic," and "willing to try new things," while he was described as being "unwilling to change," "inflexible," and having "difficulty taking criticism." While the record does show that these terms were in fact used, their use alone is insufficient to make out a claim of discrimination. Williams v. County of Westchester, 171 F.3d 98, 101-02 (2d Cir. 1999). The ADEA was designed to prevent

_____

[4] Plaintiff's brief also focuses on the fact that his marks were higher before Gilbert began evaluating him, but this is undercut by plaintiff's concessions elsewhere that Gilbert graded the comparators more harshly as well. (See Pl.'s Mem. in Opp. at 8, 12, 15.)

an employer from "rely[ing] on age as a proxy for an employee's remaining characteristics, such as productivity." Hazen Paper Co, v. Biggins, 507 U.S. 604, 611 (1993). But when the employer focuses on factors other than age, even if those factors tend to correlate with age, the stereotyping problem disappears. Id. Indeed, "[t]he ADEA does not prohibit the making of adverse employment decisions based on an employee's loss of faculties through the process of aging," but rather "requires the decision-maker to treat each individual case on its merits, rather than assume that at a certain age deterioration has occurred." Tomassi v. Insignia Fin. Group, 478 F.3d 111, 116 n.4 (2d Cir. 2007).

The principal flaw with Skiff's argument here is that there is no evidence that the terms he has identified took on any age-related meaning. A closer look at the evaluations themselves is helpful in making this assessment. On February 13, 2003, Gilbert evaluated Skiff during a 12th-grade psychology class. (Pl.'s Dep., Ex. 12.) While complimenting Skiff throughout the review (e.g., "lesson . . . include[d] good ideas and involve[d] good pedagogy"; "Teacher uses excellent vocabulary and models precise language"; "good job of creating student-centered activities"), Gilbert also provided the constructive criticism appropriate to the evaluation process. Id. Gilbert highlighted one particular area needing improvement:

Teacher reflection on lesson seems to be insufficient.
. . . . Assessment procedures must be refined.  Lesson
planning and cohesive lesson units needed.  Teacher has
excellent mastery of material but needs to find avenue
to relay this information to students so they retain
it.

Id.  The plaintiff then filed a rebuttal to this evaluation, in

which he disagreed with essentially all of Gilbert's criticisms.

(Pl.'s Dep., Ex. 13.)  According to Skiff, "the lesson was fully

successful, achieving exactly the objectives set by the teacher

for it."  Id.  He further disagreed with Gilbert's view of his

self-reflection, finding his teaching in this regard to have been

"Exemplary."  Continuing, he wrote:

One of the most consistent aspects of my teaching has
been to encourage student interest, enjoyment and
development in other areas of school academic and
social life.  Any time I sense [] opportunities to
relate[] our lessons to those in other areas, I take
them, typically encouraging students to describe their
interest or achievement in other areas.  I go out of my
way to seek out the opportunity to recognize
accomplishment or encourage participation in other
areas.

Id.  Gilbert evaluated Skiff again later that month.  (Pl.'s

Dep., Ex. 14.)  In that report, she credited his strengths:

"kindness and positive reinforcement of student efforts; interest

in understanding student needs; understanding of subject matter;

selection of topics which reflect student interests."  Id.  But

Gilbert also concluded that he needed to demonstrate "more

willingness to reflect on each lesson and adjust [his] teaching

style to meet [the] needs of students."  Id.  Skiff submitted a

31

rebuttal to this evaluation as well, taking particular issue with Gilbert's evaluation of his pedagogical methods and discussing at length his extensive education and work experience in support of his view that "[t]he lessons observed at Bacon were neatly designed and well delivered." (Pl.'s Dep., Ex. 15.) During the next school year, Gilbert and Mathieu performed a joint evaluation, identifying once more the same general concerns about plaintiff's teaching. (Pl.'s Dep., Ex. 18.) Using language that Skiff has highlighted as representing age bias, Gilbert and Mathieu wrote in part:

> Mr. Skiff refers students to SAT, gives frequent positive enforcement, and clearly cares about the well-being of his students and [the] student body as a whole. He assists with the Diversity Club and supports their extracurricular activities. Mr. Skiff gets along well with his colleagues, and we see some collaboration with department members, as well as contributions to the technology team. <u>He has some difficulty seeing beyond his own concerns, and often has difficulty taking constructive criticism regarding his teaching or ideas.</u> Collaboration with other Social Studies teachers to create joint units and uniform assessments would be a useful activity.

Id. (emphasis added). Skiff wrote in his rebuttal to this evaluation that "I do not believe anyone uses a greater variety of assessment techniques than I do." (Pl.'s Dep., Ex. 19.)

This is merely an excerpt of the plaintiff's extensive evaluative record, but nowhere is there an indication that the evaluators were using coded language to mask even a subconscious bias against Skiff on the basis of his age. Rather, his conduct

during this period is convincing evidence of him being "unwilling to change," "inflexible," and having "difficulty taking criticism": faced with critique by administrators, Skiff responded by repeatedly disagreeing with the evaluations instead of willingly adapting.  Especially given that the latter term was used in only one part of a lengthy report — during which Skiff was praised for his many strengths — no reasonable fact-finder could infer that Gilbert or Mathieu was acting with discriminatory animus.  Cf. Ash v. Tyson Foods, Inc., 546 U.S. 454, (2006) (per curiam) (vacating and remanding in part due to defendant's manager using the term "boy" to refer to the African-American petitioners).  Similarly, the terms which plaintiff argues were used in his colleagues' evaluations to indicate a preference for younger teachers are no more than descriptors of positive teaching qualities.  According to the state Board of Education guidelines, an effective teacher is one who "car[es] deeply about students and their successes"; is "passion[ate] about learning and about life"; "demonstrat[e] enthusiasm, self-confidence, and caring"; and "reflect[s] upon and analyz[es] the process of teaching."  (Conn.'s Common Core of Teaching, Ex. F.) On this record, no reasonable jury could conclude that the language used with respect to Skiff or the other teachers signaled a bias on account of age.

Although the plaintiff has established a prima facie claim

of discrimination, the evidence is insufficient to reasonably conclude that the stated justifications were merely a pretext for an underlying discriminatory motive.  His ADEA claim must therefore fail because he has not carried his burden of showing that the non-renewal decision was made at least in part based on his age; as discussed <u>supra</u>, plaintiff's equal protection claim of selective prosecution also fails for the same reason.

**III. Conclusion**

Accordingly, defendants' Motion for Summary Judgment [Doc. # 35] is GRANTED.  The Clerk is directed to close the case.


IT IS SO ORDERED.



/s/_____

JANET BOND ARTERTON, U.S.D.J.


**Dated at New Haven, Connecticut, this 27th day of September, 2007.**